UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL CLARK,

        Plaintiff,                              CASE NO.:2:06-CV-14270

vs.                                             DISTRICT JUDGE NANCY G. EDMUNDS
                                                     MAG. JUDGE STEVEN D. PEPE

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL SECURITY,
        Defendant.
_____/

## Report and Recommendation

**1. BACKGROUND**

Daniel Clark brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner finding that Plaintiff was not entitled to Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, **IT IS RECOMMENDED** that the Commissioner's motion for summary judgement be **GRANTED** and Plaintiff's motion for summary judgment be **DENIED.**

**A. Procedural History**

Plaintiff applied for DIB on July 11, 2003, (R. 49-51), alleging that he became disabled in June 13, 2002, due to severe bilateral ulnar neuropathy and asthma (R. 17). After Plaintiff's claim was initially denied (R. 23-37), a hearing was held on June 27, 2005, before Administrative Law Judge Richard D. Wurdeman (ALJ) (R. 16-21). Plaintiff was represented by his current attorney and Vocational Expert (VE) James R. Engelkes, Ph.D., also testified (R. 16).

ALJ Wurdeman concluded in a September 8, 2005, decision that Plaintiff was not under a disability as defined by the Act because he remained capable of performing a significant range of

light work (R. 17). The Appeals Council denied Plaintiff's request for review (R. 4-6).

**B.      Background Facts**

   **1.      *Plaintiff's Hearing Testimony and Statements***

Plaintiff was born on December 15, 1956, and was forty-eight years old at the time of the hearing (R. 289). Plaintiff has only had one employer, General Motors, but had different positions with them during the period from 1976 until 2002 (R.299). Plaintiff's most recent position was forklift driver and the vocational expert claimed that it was "semi-skilled and light on exertion." Prior to that, he was a checker for about a year and a half which was unskilled and light exertion. He was another type of checker for twelve months prior that was medium exertion and unskilled (R. 299).

Plaintiff claims that on June 13, 2002, the last day he worked he became disabled (R. 289). Due to surgeries and problems with his arms, Plaintiff was told by his doctor that repeated use of his arms could cause total loss of use. *Id.* Plaintiff uses a vacuum, but takes breaks because it creates "problems" (R.297). Plaintiff takes medication without any side effects, and currently takes medication including asthma medicine, Tylenol arthritis and Darvon (R. 290, 297). Plaintiff suffers from pain in both arms that generates from his elbows down into his forearms (R. 291). This pain is on the outside of his arm along his ulnar nerve upon which he had surgery. *Id.*

Plaintiff claims not to have "too much" trouble sitting or standing, but is only able to stand for about a half hour. Plaintiff walks about 20 or 30 minutes, but has to stop because of shortness of breath (R. 292-93). Plaintiff is able to shop for groceries by picking up a few things at a time (R. 290). He hires people to do his yard work, but does housework a little at a time (R. 290). Plaintiff can lift no more than a gallon of milk, but must use both hands and can lose his grip (R. 293). Plaintiff has problems pushing, pulling and reaching overhead. Plaintiff sometimes gets "just tired"

opening lids on jars of pop bottles (R. 293). Plaintiff also has problems "doing buttons" as it takes a while to get his fingers "motivated" (R. 293).

When writing Plaintiff must stop for 40-45 minutes because his hands start shaking and cramping up after writing a paragraph or two (R. 294). Plaintiff generally drives three or four times a week and must keep switching hands if driving 20 miles or more (R. 295). Plaintiff claims that his fingers do not always do what he wants them to do. Some it takes "awhile to...pick out a dime or nickel" due to a loss of dexterity (R. 296). Plaintiff has no hobbies that require fine finger activity, and spends his time watching TV and doing some laundry and cleaning (R. 296). Plaintiff does sign checks by hand (R. 297).

### 2. *Medical Evidence*

On January 29, 2001, Dr. Kingzer was provided an electrodiagnostic assessment by Dr. Carmen Ventocilla, M.D. of Rehabilitation Medicine Physicians, P.C. (R. 99-101). Dr. Ventocilla determined that: there continues to be evidence of (1) mild bilateral median mononeuropathies at the wrist, left slightly greater than the right (carpal tunnel syndrome) with evidence of mild focal demyelination without axonal degeneration; (2) bilateral mild ulnar nerve sensory monomeuropathies without evidence of motor involvement; (3) mild focal demyelination without axonal degeneration (R. 100). There was little change compared to previous studies; and there was no electrodiagnostic evidence of either a right of left cervical radiculapathy or brachioplexopathy.

On January 30, 2001, Kenneth E. Stephens. Ph.d., D.O., examined Plaintiff and determined that Plaintiff demonstrates signs of possible ulnar nerve irritation (R. 150). At the March 20, 2001, examination, Dr. Stephens discussed the possibility of surgery on this left elbow to try and alleviate some of the discomfort (R. 145).

On April 5, 2001, went to the Genesis Surgery Center for surgery relating to his left ulnar

nerve. The diagnosis was (1) compression on left ulnar nerve and (2) status post left ulnar nerve transposition (R. 92).

On May 8, 2001, Dr. Stephens examined Plaintiff and determined that he "could return to restrict work duties at this point in time using an elbow pad" (R. 142).

On June 17, 2001, Plaintiff underwent a chest examination, due to complaints of chest pain, at the Ingham Regional Medical Center (R. 113). Test results showed that the lungs are clear, no vascular congestion, pleural effusion, acute fracture, or pneumothorax is demonstrated (R. 113).

On June 13, 2002, Plaintiff went to Genesis Surgery Center for on going problems associated with ulnar neuropathy on his right arm after treatment had failed (R. 90). The diagnosis was "right ulnar neuropathy at the elbow" and the operative procedures was "right ulnar nerve decompression at the elbow" (R. 90). These problems were confirmed by EMG, and Plaintiff agreed to proceed with surgery (R. 91).

On July 23, 2002, Dr. Stephens examined and informed Plaintiff that he would unlikely be able to return to his current job. On August 27, 2002, Dr. Stephens placed Plaintiff on permanent work restrictions limiting him to jobs with no repetitive wrist flexion or extension or elbow flexion and extension activities. He was also to avoid any repetitive grasping activities or use of torque or pneumatic tools (R. 127).

On November 26, 2002, Dr. Stephens re-evaluated Plaintiff and stated that he does not believe that Plaintiff is going to be able to return to manufacturing work using either his right or left arm (R. 124).

On December 5, 2002, Dr. Ventocilla provided Dr. Stephens with an updated assessment compared to the previous study performed on January 24, 2001 (R. 94-96). It found that (1) interval improvement in the left median mononeuropathy at the wrist, with evidence of very mild

focal demyelination which persists without evidence of axonal degeneration; (2) there was no electrodiagnostic evidence of right median mononeuropathy at the wrist; and (3) the ulnar mononeuropathies bilaterally was essentially resolved. The prolongation of the left ulnar dorsal sensory cutaneous evoked response on the left and the absence of the right response were residual effects of previous ulnar neuropathies. Ulnar nerve conduction studies were within normal limits bilaterally without evidence of a focal lesion (R. 95).

On February 27, 2003, Dr. Stephens performed a subcutaneous ulnar nerve transposition on the Plaintiff (p. 105-112). Prior to surgery, Plaintiff complained that pain in his right elbow was worsening, he was getting occasional numbness and tingling and his grip strength had decreased even though the test "demonstrated an improvement in the ulnar nerve function and resolved right median neuropathy" (R. 105-6).

On May 13, 2003, Dr. Stephens examined Plaintiff and noted that Plaintiff would benefit from "a job re-education program to one which would avoid repetitive elbow flexion and extension activities as well. I do feel he needs a functional capacity evaluation" (R. 117).

On June 24, 2003, Dr. Stephens examined Plaintiff and noted his doubts that Plaintiff could "engage in any manual labor for wages" (R. 224).

On November 14, 2003, Edna Feibusch conducted a Physical Residual Functional Capacity Assessment (R. 215-222). She determined that Plaintiff could occasionally lift weights up to ten pounds, frequently lift weights up to ten pounds, stand or sit about six hours of each eight hour work day, and is limited to pushing or pulling weights under ten pounds (R. 216).

On February 3, 2004, Dr. Stephens examined Plaintiff and noted that medication and several surgeries have not alleviated his discomfort (R. 224). Dr. Stephens also noted that he had nothing more to offer Plaintiff surgically and suggested the Plaintiff consider visiting the Mayo Clinic (R.

224).

### B. *Vocational Evidence*

VE Engelkes characterized Plaintiff's most recent forklift position as semi-skilled and light on exertion (R. 299). Prior checker positions were characterized as unskilled and light to medium on exertion (R. 299).

When asked a hypothetical question regarding a job with a light level of exertion, lifting no more than 10 pounds, working only in a clean air environment and possessing moderate impairment to fine finger dexterity, the VE responded that such a person could not perform Plaintiff's prior jobs, even the light exertion ones because of the clean air part of the hypothetical (R. 299-300).

VE Engelkes stated that such a person could perform work as a host in the hotel/restaurant and wholesale/retail industries, and could also work as a greeter or collator operator. All of these positions are classified as light exertional unskilled positions (R. 300). He calculated that in the lower peninsula of Michigan there are roughly 5000 host, 5000 collator, and 3000 greeter positions, and nationally 155,000 host, 155,000 collator and approximately 90,000 greeter positions (R. 301). None of these jobs would involve forceful pushing or pulling with the arms, and "hands are a minimal part" of each of these jobs (R. 301).

### C. **ALJ Wurdeman's Decision**

ALJ Wurdeman found that Plaintiff met the disability insured status requirements on his alleged onset date, June 13, 2003, through April 27, 2006, and that he had not engaged in substantial gainful activity since that time (R. 20). Plaintiff's status is post multiple surgeries for bilateral ulnar neuropathy and suffers from asthma (R. 20). Yet, the disorders did not meet the listing of

impairment disorders which are "severe." ALJ Wurdeman found that Plaintiff has lost the residual functional capacity to perform his past, relevant work. Given that Plaintiff is younger and possesses a high school education, there is no issue of transferable skills.

ALJ Wurdeman found that there were a significant number of jobs in the national economy that he could perform (R. 15). In his decision immediately after referring to the VE testimony, he found Plaint not to be disabled which he represented in his findings (R. 20-21).

## II.　ANALYSIS

### A.　Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes

Plaintiff in all significant, relevant respects.[1] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

    **B.**     <u>**Factual Analysis**</u>

In his Motion for Summary Judgment, Plaintiff argues that his case should be remanded for an award of benefits because he meets or equals the impairment listing 1.02(B) or 11.14. Alternatively, Plaintiff argues that (1) this case should be remanded for further proceedings so that a medical expert approved by the Commissioner can evaluate the medical records of evidence and testify as to the severity of Mr. Clark's conditions, and (2) that error had occurred as a single decision maker filled out and signed the denial and Physical RFC Assessment. This action, according the Plaintiff, violates 20 C.F.R. § 404.1526(e), which requires that "where the State agency or other designee of the Commissioner makes the initial or reconsideration disability determination, a State agency medical or psychological consultant or other designee of the Commissioner has the overall responsibility for determining medical equivalence" (Dkt. # 1, p. 10).

*Listing 1.02*

Plaintiff claims that his condition meets Listing 1.02B and that his case should be remanded for an award of benefits. If "a claimant can show an impairment that meets the duration requirement (12 months) and is listed in Appendix 1 (the 'listings'), or is equal to a listed impairment, the ALJ must find the claimant disabled . . . ." *Gambill v. Bowen*, 823 F.2d 1009, 1011

---

[1] *See, e.g.*, *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinburger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

(6th Cir. 1987). *See also* 20 C.F.R. § 404.1520(d) (2000). To meet a listing, a claimant "must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added).

> Listing 1.02B states:
>
> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).
>
> B. With: Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(B). The definition of ineffective ambulation is provided in § 1.00(B)(2)(c):

> What we mean by inability to perform fine and gross movements effectively. Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(c).

Thus, in order to meet the listing, Plaintiff must demonstrate that (1) for at least 12 months, he has had a major dysfunction of a joint(s); (2) gross anatomical deformity; (3) chronic joint pain and stiffness; (4) medical finding of joint space narrowing, bony destruction or ankylosis of the

affected joint(s) with; (5) involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively.

Because the workplace injury occurred on June 13, 2002, and Plaintiff was still being treated at least until February 4, 2004, the duration requirement has been met (P. 224). The Record shows that he had difficulty grasping change or writing. Dr. Stephens' reports indicate that he did not think that Plaintiff could return to his prior job. Plaintiff testified that he sometimes has trouble picking up change and sometimes loses his grip (R. 296, 293). Yet, Plaintiff stated that he takes care of daily things like grocery shopping and housework (R. 290). Furthermore, Plaintiff's Physical Residual Functional Capacity Assessment did show that Plaintiff could push or pull up to ten pounds (R. 215, 216).

While experiencing some severe upper extremity limitations, a reasonable fact finder could conclude that Plaintiff has not demonstrated the "inability to perform fine and gross movements effectively" and has not demonstrated an "extreme loss of function" of his upper extremities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B(2)(c). While limited in his actions, limitations, a reasonable fact finder could conclude that Plaintiff has not demonstrated that he is unable to sustain "such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." *Id.*

The medical evidence, therefore, does not show as a matter of law that Plaintiff satisfies the requirements of Listing 1.02(B). ALJ Wurdeman could reasonably determine that Plaintiff's impairments did not meet or equal a listed impairment. 1.02(B).

***Listing 11.14:***

Plaintiff claims that listing 11.14 applies to him, as well. Listing 11.14 covers "peripheral neuropathies with disorganization of motor function as described in 11.04B, in spite of prescribed

treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14.

Listing 11.04(b) applies to "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (See 11.00C)."

Listing 11.00C requires:

> persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerbellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C.

Plaintiff again references the problems he faces in completing daily functions. Yet, Plaintiff has failed to provide a medical diagnosis to substantiate his meeting this Listing. Plaintiff provides no evidence showing that he suffers from "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerbellar, brain stem, spinal cord, or peripheral nerve dysfunction)." Claims of disorganization of motor function in the two extremities exceed the work restrictions imposed by Dr. Stephens, " no use of torque or air tools; no repetitive gripping, repetitive elbow flexion or extension; no wrist flexion or extension; and no diving a forklift, manufacturing or line work" (R. 117). In fact, Plaintiff's Physical Residual Functional Capacity Assessment notes that he is able to push or pull weights amounting to ten pounds or less (R. 215, 216).

The medical evidence, therefore, does not show as a matter of law that Plaintiff satisfies the requirements of Listing 11.14. ALJ Wurdeman could reasonably determine that Plaintiff's impairments did not meet or equal listed impairment 11.14.

***Request in the Alternative:***

Alternatively, Plaintiff has requested "a subsequent hearing . . . where a medical expert approved by the Commissioner can evaluate the medical records and testify as to the severity of Mr. Clark's conditions" (Pl. Br. at 10). This request is without merit. Plaintiff has had ample opportunity to demonstrate the severity of his injuries. The record has carefully documented the medical determinations of Plaintiff's physician, Plaintiff's Physical Residual Functional Capacity Assessment, VE Engelkes' testimony as well as the determinations by ALJ Wurdeman and the Appeals Council. The Record shows that Plaintiff has failed to provide medical evidence that his injuries, although considerable, meet the criteria established by Listings 1.02B and 11.14. There are not grounds to revisit the issues.

### *Request for Remand:*

Finally, Plaintiff has requested that this case be remanded as the denial and Physical RFC Assessment form were both filled out and signed by single decision maker (Dkt. # 1, p. 10). Edna Feibusch completed the physical RFC form (R. 215-222) and also the initial denial (R.22) referring to her RFC evaluation noting this was a Disability Redesign Prototype Case ("DRPC"). Such an action, according to the Plaintiff violates 20 C.F.R. § 404.1526(e) which requires that equivalence determinations be completed by a state agency or medical or psychological consultant instead of a single decision maker.

The Regulations determine who makes medical equivalency determination at each stage. Plaintiff's cite no authority that this court has any legal basis to overturn the Commissioner's decision for any errors made at the initial stage. The final decisions for this Court 20 C.F.R. §404.1526(e) is the ALJ's decision which was upheld by the Appeals Council. The Regulation states that "for cases at the Administrative Law Judge or Appeals Council level, the responsibility for deciding medical equivalence rests with the Administrative Law Judge or Appeals Council."

20 C.F.R. § 404.1526(e). Both ALJ Wurdeman, in finding number 6 (R. 20), and the Appeals Council rejected Plaintiff's claims that his injuries met the criteria laid out in Listings 1.02B and 11.14. Accordingly, the decision before the Court is in compliance with the Regulations.

Substantial evidence supports the decision of ALJ Wurdeman. Furthermore, Plaintiff has failed to identify any harmful error in his decision.

### III. RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED** and that Plaintiff's Motion for Summary Judgment be **DENIED**. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

DATED: October 22, 2007                s/ Steven D. Pepe
                                       STEVEN D. PEPE
                                       United States Magistrate Judge


CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2007 , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification to the following: James A. Brunson, ASA, Mike E.Lupisella, Esq., and I hereby certify that I have mailed by U.S. mail the paper to the following non-ECF participants:  Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606

                                       s/ James P. Peltier
                                       James P. Peltier
                                       Courtroom Deputy Clerk
                                       United States District Court
                                       600 Church St.
                                       Flint, MI 48502
                                       810-341-7850
                                       pete_peltier@mied.uscourts.gov